DA 07-0751

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 321

JAYDON PAULL,

      Plaintiff and Appellant,

  v.

PARK COUNTY, MONTANA, and
STATE OF MONTANA,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DV 06-86
Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Courtney Jo Lawellin (argued), Walter Madden, Attorneys at Law,
Livingston, Montana

      For Appellees:

            Thomas G. Bowe (argued), Assistant Attorney General; Agency
Legal Services Bureau, Helena, Montana (for State of Montana)

            Steven R. Milch (argued), Matthew S. Brahana (argued); Crowley,
Haughey, Hanson, Toole & Dietrich, P.L.L.P., Billings, Montana (for Park
County, Montana)

                Argued: January 14, 2009
          Submitted: March 24, 2009
           Decided: September 29, 2009

Filed:

      _____
                       Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    This is an appeal by Jaydon Paull from the November 26, 2007, order of the District Court of the Sixth Judicial District, Park County, granting summary judgment to Park County and the State of Montana. We reverse.

¶2    Paull presents issues for review that we restate as follows:

¶3    Issue One: *Whether the District Court erred in holding that the County did not have a duty to Paull concerning his transport as a prisoner from Florida to Montana to respond to a probation revocation.*

¶4    Issue Two: *Whether the District Court erred in holding that the State did not have a duty to Paull concerning his transport as a prisoner from Florida to Montana to respond to a probation revocation.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶5    Paull received a deferred sentence for burglary and theft in 2000 from the Sixth Judicial District Court, Park County, and was placed on probation. He failed to report to his probation officer and traveled to Florida without permission. In 2001 the State commenced probation revocation proceedings and transported Paull from Florida to Montana using a private prisoner transportation service called Extraditions International. When Paull arrived in Park County he complained to the Sheriff that the trip from Florida had been "torture" and that he had been poorly treated.

¶6    The result of the 2001 probation revocation proceeding was that Paull was sentenced to the Montana Department of Corrections for six years, all suspended, and

2

was placed on probation under the supervision of the Adult Probation and Parole Division of the Montana Department of Corrections (DOC). Paull obtained permission from Montana Adult Probation and Parole to move to Florida, where he was subject to supervision by probation officials of the State of Florida pursuant to the Interstate Compact for Adult Offender Supervision, § 46-23-1115, MCA.

¶7 In December 2002, Paull's Florida probation officer informed Montana Adult Probation and Parole that Paull had violated the conditions of his probation. Based upon this report, the Montana DOC prepared a report of violation, a recommendation that Paull's probation be revoked, and a request that a warrant issue for his arrest. The DOC report was sent to the Park County Attorney, who prepared and filed a petition in the District Court to revoke Paull's probation. The District Court issued a warrant for Paull's arrest, and it was executed by authorities in Florida in February, 2003. Paull was held in custody without bond "for Montana" by Florida authorities.

¶8 The Park County Sheriff's office then became involved in arranging to transport Paull to Montana. The Sheriff's office contacted a private prisoner transportation service called American Extraditions (AEI), a successor to Extraditions International that had transported Paull to Montana in 2001. After receiving a price quote for the trip, the Sheriff's office followed required State procedure and contacted the Montana Governor's office to obtain approval of the expenditure.

¶9 The State of Montana maintains a Prisoner Transportation Fund to reimburse counties for the costs of transporting prisoners. Beginning in 1993, Gov. Marc Racicot, as a cost-cutting measure, required that counties obtain prior approval for the use of state

3

prisoner transportation funds. A letter from the Governor announcing this policy cautioned that only prisoners charged with more serious offenses and with higher bonds should be considered for interstate transportation. The policy encouraged the use of private prisoner transportation services for long-distance interstate transport.

¶10 AEI employees picked up Paull from Florida authorities in February, 2003. He was shackled at the wrists and ankles and placed in a large passenger van with other prisoners. The van had two uniformed drivers employed by AEI, who were in charge of the prisoners during the nine-day trip from Florida to Montana. The van was equipped with a divider between the prisoners and the drivers that allowed the drivers to observe the prisoners. The prisoners were shackled but the van did not have seatbelts and did not have toilet facilities for their use.

¶11 Paull's complaint alleged that he and the other prisoners were mistreated during the trip primarily by being denied sufficient toilet stops. He alleges that the drivers would stop to relieve themselves, but would not allow the prisoners to do so, and that this resulted in the prisoners defecating and urinating on themselves and in the van during the trip.

¶12 On March 5, 2003, the van was on the interstate highway near Dillon, Montana. Paull's complaint alleges that the prisoners had not been provided a bathroom break in many hours, and that the drivers had told them to urinate into plastic cups or water bottles. Paull alleges that as the prisoners were urinating into plastic containers the AEI driver was watching them and laughing, while swerving the van trying to cause them to spill urine on themselves. In so doing, the driver lost control of the van and it rolled

4

several times, coming to rest on its top. The other AEI driver was killed in the accident and Paull alleges that he was injured.

¶13 AEI had no insurance and dissolved after the accident, leaving persons with claims with no practical recourse against AEI for loss or injury. Taking at face value the defendants' assertions that they had no knowledge of AEI's practices, it is clear that neither undertook to ascertain whether AEI had a safe operation, whether AEI was bonded or insured, or whether AEI adhered to minimum standards for the care and custody of prisoners. Both the State and the County adamantly disclaim any control, oversight, or even knowledge of the practices and procedures of AEI. AEI was therefore left entirely to its own devices, at least as far as the State and County were concerned.

¶14 Paull brought suit against Park County and the State, alleging that they were responsible for his injuries. The County and State answered and moved for summary judgment. After allowing Paull a period in which to conduct discovery and after briefing and oral argument, the District Court granted summary judgment to the County and State. Paull appeals.

¶15 The County and the State each argued below that they owed no actionable duty to Paull because his injuries were inflicted by AEI or its employees. The State contended that it had no connection to AEI and that neither AEI nor the County was its agent in transporting Paull. The County made similar arguments, and further contended that it owed no duty to Paull because it was not foreseeable that injury to him might result from hiring AEI and seeking approval of the transportation costs.

5

¶16     The District Court held that the State owed no duty to Paull because it did not have any contractual or agency relationship with AEI.   As to the County, the District Court held that a contractor-independent contractor relationship existed between the County and AEI, and therefore the County had no duty either.

## STANDARD OF REVIEW

¶17     We review a district court's rulings on summary judgment de novo, applying the same criteria as the district court under M. R. Civ. P. 56.  *Beckman v. Butte-Silver Bow County*, 2000 MT 112, ¶ 11, 299 Mont. 389, 1 P.3d 348.

## DISCUSSION

¶18     *Issue One:  Whether the District Court erred in holding that the County did not have a duty to Paull concerning his transport from Florida to Montana to respond to a probation revocation.*

¶19     In *Beckman* the plaintiff was employed by a company that was excavating and constructing a water pipe line for Butte-Silver Bow County.  Beckman was injured when the trench where he was working collapsed.  Beckman sued the County, which contended that it was not liable for Beckman's injuries under the general rule that contractors are not liable for torts of their independent contractors.   This Court noted that there are exceptions to the general rule, which include (1) where there is a nondelegable duty based on a contract; (2) where the activity is inherently or intrinsically dangerous; and (3) where the general contractor negligently exercises a reserved right of control over a subcontractor's work.  *Beckman*, ¶ 12.

6

¶20 The primary issue in *Beckman* was whether the work was inherently dangerous so as to come within the second exception to the general rule, applying §§ 416 and 427 of the Restatement (Second) of Torts. Those sections allow a general contractor to be liable for the acts or omissions of an independent contractor when the work involves a "peculiar risk of harm" or a "special danger to others." This Court held that contractors are not liable for every tort by an independent subcontractor engaged in such inherently dangerous work, but only those "torts which arise from the unreasonable risks caused by engaging in that activity." *Beckman*, ¶ 22. We abandoned distinctions made in earlier cases based upon whether dangers could be avoided by standard precautions or required special precautions. Instead, we adopted a rule that a contractor "is vicariously liable for injuries to others caused by a subcontractor's failure to take precautions to reduce the unreasonable risks associated with engaging in an inherently dangerous activity." We concluded that trenching operations are inherently dangerous as a matter of law. *Beckman*, ¶ 24. Therefore, Butte-Silver Bow County could be liable for torts committed by its independent contractor.

¶21 Other activities have been considered under Montana law and held to be inherently dangerous. *Ulmen v. Schwieger*, 92 Mont. 331, 12 P.2d 856 (1932) (highway construction); *Stepanek v. Kober*, 191 Mont. 430, 625 P.2d 51 (1981) (construction scaffolding); *Cash v. Otis Elevator*, 210 Mont. 319, 684 P.2d 1041 (1984) (elevators); *Brewer v. Ski Lift*, 234 Mont. 109, 762 P.2d 226 (1988) (skiing); *McMillan v. U.S.*, 112 F.3d. 1040 (9th Cir. 1997) (felling snag trees, applying Montana law); *Oberson v. U.S.*, 2007 MT 293, 339 Mont. 519, 171 P.3d 715 (snowmobiling). Whether an activity is

inherently dangerous is a question of law. *Fabich v. PPL Montana*, 2007 MT 258, ¶ 32, 339 Mont. 289, 170 P.3d 943.

¶22    The first step in applying this law to the County is determining whether it was in a contractor-independent contractor relationship with AEI.[1]  The County does not contest the District Court's determination that there was a contractual relationship between it and AEI.  Rather, the County argues that none of the *Beckman* exceptions applies and therefore it is not vicariously liable for any torts of AEI.  The District Court so held, concluding that the activity undertaken by AEI was "driving" and that driving is a common activity which is not inherently dangerous.  We disagree and hold that the transportation of prisoners is more than just driving and is an inherently dangerous activity.  Therefore, under *Beckman*, a county or other governmental entity that contracts to have prisoners transported may be held vicariously liable for injuries caused by an independent contractor that provides prisoner transport services.  Any such claim must still be established under the ordinary rules of negligence, requiring proof of the existence of a legal duty, breach of duty, causation and damages, on the part of the contractor. *Causenbary v. Mortensen*, 1999 MT 221, ¶ 21, 296 Mont. 25, 987 P.2d 351.

---

[1] None of the parties on appeal discusses why the County was responsible for arranging transportation of Paull from Florida to Montana.  The County Sheriff did not execute the District Court's arrest warrant, the law enforcement authorities in Florida did, and the warrant itself was not made part of the record on appeal.  There are statutes that provide for reimbursement to sheriffs for conveying persons to a "magistrate or to a detention center" (§ 7-32-2143, MCA) and for reimbursement of expenses incurred in returning fugitives apprehended outside the county (§ 7-32-2145, MCA).  Neither of these statutes places an express duty on a sheriff to assume responsibility of bringing a State prisoner to Montana from another state.  The County nonetheless assumed the responsibility for Paull's transport from Florida, and since no party raised the issue of whether the County was in fact legally responsible we will not address it further.

¶23 We reach this conclusion because there are multiple dangers inherent in prisoner transportation that separate it from ordinary driving. The transportation of prisoners is, by its nature, a unique and inherently dangerous activity. The risks arising from that activity apply not only to the prisoners and transport employees but to the public at large. The most obvious danger is that those being transported are often persons charged with or convicted of serious criminal offenses. The 1993 policy by Gov. Racicot expressly directed that the counties transporting prisoners should choose to transport prisoners with prior criminal records, more serious offenses, and higher bonds. The policy also encouraged counties to select private contractors for interstate transport services. The policy therefore expressly promotes situations in which private non-law enforcement contractors will be transporting serious offenders across the country. This is not ordinary driving.

¶24 When such prisoners are transported, especially over long distances over multiple days that require at least some stops along the way, security concerns make even food and bathroom stops potentially dangerous events. Prisoner escape is clearly always a concern and danger. *See State v. Savaria*, 245 Mont. 224, 800 P.2d 696 (1990) (escape during transport to a court appearance). Prisoners who escape or attempt to escape during transport present an inherent danger to themselves, to the guards or others charged with securing them, and to the public. The County notes that there are Federal regulations, found at 28 C.F.R. pt. 97 (2008), setting standards for "private companies that transport violent prisoners on behalf of State and local jurisdictions." 28 C.F.R. § 97.1. The regulations apply only to the transportation of violent prisoners, and set

9

minimum standards for such things as employee training and background checks, driving times, uniforms and identification. The regulations also specify mandatory restraints for prisoners (28 C.F.R. § 97.17); notification of local law enforcement 24 hours in advance of any scheduled stops (28 C.F.R. § 97.18); immediate notification of local law enforcement if there is an escape (28 C.F.R. § 97.190); and adoption of policies to protect the health and physical safety of the prisoners (28 C.F.R. § 97.20). The regulations expressly do not pre-empt any applicable state or local regulations (28 C.F.R. § 97.22). The federal regulations serve to enforce the conclusion that interstate prisoner transportation is an inherently dangerous activity.

¶25 When long-distance interstate transportation of prisoners is undertaken, it presents even higher dangers. In Paull's case the transported prisoners were restrained with wrist and ankle shackles and were confined in the van behind a partition that separated them from the drivers. There was no toilet facility in the van and the complaint alleges that few toilet breaks were provided. It should come as no surprise that prisoners confined in squalid and painful conditions, as alleged in this case, would be more likely to become aggressive and hostile and more likely to attempt escape or engage in other dangerous activities than if they were treated humanely and were transported expeditiously. Paull's trip from Florida to Montana took nine days, getting only as far as the Dillon area before the accident happened.

¶26 The complaint alleges that AEI provided staff who failed to provide for the basic physical needs of the prisoners during the trip. Perhaps most importantly, AEI provided staff who, as alleged in the complaint, built upon that failure by purposely driving in a

10

dangerous and erratic manner precisely because there were disgruntled prisoners in the back of the van. While the defendants describe the accident as resulting from the driver swerving, the complaint alleges that the driver was taunting the prisoners by deliberately swerving the van in an attempt to cause them to spill urine on themselves. This alleged behavior, which at this point has not been proven or disproven, led to death and injury.

¶27 Law enforcement agencies have complex hiring processes with the goal of selecting well-qualified personnel who are then trained for activities such as prisoner transport. Law enforcement administrators understand the dangers posed to the public, to law enforcement personnel and to those in custody by inadequate hiring, training and supervision of officers. When a similar level of care is not applied to law enforcement related activities like interstate prisoner transportation, tragic events such as the crash in this case can occur.

¶28 The conduct of the AEI driver that allegedly led to the crash was not some kind of innocent "horseplay." The misconduct alleged by Paull arose because the van was transporting prisoners on an extended interstate trip, and because those prisoners were complaining to the driver about the conditions under which they were being held. This aspect of the event is therefore a result of the inherent risk of the enterprise of prisoner transportation.

¶29 Long distance prisoner transportation, like the trenching in *Beckman*, is an inherently dangerous activity as a matter of law. Here, while the injury to the plaintiff did not occur as a result of the typical unreasonable or unique risks inherent in prisoner transport—such as attempted escape or assault by prisoners—it arguably occurred in this

11

case as a result of the failure of the State or the County to take any precaution whatsoever to provide for the safe and humane transport of the prisoners. Furthermore, as alleged in the complaint, the accident occurred because prisoners were being transported in unacceptable conditions. It was foreseeable that those alleged conditions could have caused unrest among the prisoners, conflicts with the guard drivers and a crash of the van. It was foreseeable because, in this situation, unlike other activities previously deemed inherently dangerous (e.g., trenching, scaffolding, log transport) there are two factions of persons--captors and captives--confined in a small uncomfortable space that can foster mutual animosity one toward the other. In such a potentially hostile environment, it is foreseeable that an action by one group can trigger a quick and potentially dangerous reaction from the other. The mix of these potentially antagonistic forces is a material factor that makes prisoner transport inherently dangerous.

¶30    We affirm our holding in *Beckman* that a contractor is not liable for every tort by an independent subcontractor engaged in inherently dangerous work, but only those torts which arise from risks caused by engaging in such dangerous activity. Considering the singular circumstances of this case, we conclude that the risk of driver misconduct was an inherent danger in the transportation of prisoners, which is inherently dangerous work, and that it is a part of the peculiar risk of harm which arose from engaging in that activity. *See Beckman*, ¶ 22. Thus, the tortious conduct alleged by Paull falls within an exception to the rule that a contractor may not be held liable for the torts of an independent subcontractor. Under *Beckman*, the County may therefore be subject to vicarious liability for the acts or omissions of its contractor, AEI.

12

¶31 *Issue Two: Whether the District Court erred in holding that the State did not have a duty to Paull concerning his transport as a prisoner from Florida to Montana to respond to a probation revocation.*

¶32 The situation of the State in this case is different. Paull alleges negligence and asserts an agency relationship. The State emphasizes that there was no direct contact between it and AEI. Under the facts as alleged and presented to the District Court in the summary judgment proceedings, the State's connection to AEI was to constrain and approve the County's selection of AEI and to agree to reimburse the County for the cost. However, AEI, a private enterprise that no longer exists, had no independent authority to confine Paull and transport him in shackles from Florida to Montana absent authority from the State of Montana to do so. When Paull was arrested in Florida and held "for Montana," the power and responsibility to confine and transport him arose from the State of Montana. Without some actual or apparent authority derived from the State, AEI had no basis for shackling Paull, confining him, and transporting him across the country.

¶33 The District Court considered but rejected Paull's argument that the State had a duty to transport him safely and humanely. Paull asserted, for example in his Prediscovery Disclosures filed in the District Court on June 19, 2007, that the State could not avoid the consequences of that duty by delegating responsibility for transporting him to the County or AEI. The State concedes that it owes a duty of ordinary care to prisoners in its actual custody. We disagree that the State's duty ends when the prisoners are not in the State's actual custody. Paull was a person convicted by and sentenced under the authority of the State of Montana. He was granted probationary status and ordered to

13

live under a set of restrictions imposed by the State District Court, and was supervised by State employees. He was required to obtain permission from the State of Montana to travel to Florida. When Florida authorities informed the State that Paull had violated conditions of probation, the State of Montana commenced a proceeding to revoke his probation and to have him arrested by Florida authorities. The purpose of bringing Paull back from Florida was a probation revocation proceeding in State court, the consequences of which could be to either extend the State's supervision over him or incarcerate him in the State prison.

¶34 When Paull was in Florida he was supervised on probation by Florida authorities pursuant to the Interstate Compact for Adult Offender Supervision. Section 46-23-1115, MCA. The purpose of the Compact is to promote public safety, protect rights of victims through control and regulation of interstate movement of offenders, to provide for the supervision of offenders in the member states, and "to equitably distribute the costs, benefits and obligations of the compact among the compacting states." Section 46-23-1115, Article I(2), MCA. The Compact also provides:

> The states entering into this compact recognize that they are responsible for the supervision of offenders who are authorized pursuant to this compact to travel across state lines to and from the compacting states, and that the compacting states are responsible for tracking the location of offenders, transferring supervision authority in an orderly and efficient manner, and when necessary, returning an offender to the originating jurisdiction.

Section 46-23-1115, Article I(1), MCA. This subsection of the Compact, which is part of Montana law, recognizes the State's responsibility for its probationers, and for returning offenders when necessary. Moreover, officers of this State may enter another state at any

14

time to apprehend an offender under supervision there. Section 46-23-1115, Article I(4), MCA.

¶35 Probation is an "act of grace" by the sentencing court, *State v. Boulton*, 2006 MT 170, ¶ 15, 332 Mont. 538, 140 P.3d 482, that results in a "form of contract" between the sentencing court and the probationer. *State v. Burke*, 235 Mont. 165, 171, 766 P.2d 254, 257 (1988). Like incarceration, probation is a restrictive criminal sanction that represents one point on a continuum of possible punishments. *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S. Ct. 3164, 3168-69 (1987). Restrictions placed on probationers are imposed to insure that probation is a period of rehabilitation and that the community is not harmed by the probationer's being at large. *Griffin*, 483 U.S. at 875, 107 S. Ct. at 3169. Probation is a status of conditional liberty depending upon adherence to the state's special restrictions and conditions. *State v. Boston*, 269 Mont. 300, 305, 889 P.2d 814, 816 (1994). The State's probation supervision system assumes that probationers are more likely than average to commit crimes in the community. *State v. Moody*, 2006 MT 305, ¶ 20, 334 Mont. 517, 148 P.3d 662. Contrary to the State's argument, its involvement was much more significant than merely approving funds to pay for the transportation costs.

¶36 For these reasons Paull was in a continuing relationship with the State of Montana during the time it chose to return him from Florida to face proceedings in the courts of this State. It was the State that wanted Paull returned to Montana to answer to its process. Paull was under State authority and supervision. It was the State that caused him to be arrested in Florida and to be held "for Montana." Paull was Montana's

15

prisoner at least from the time he was picked up by AEI from the arresting law enforcement authorities in Florida. No contractor-independent contractor relationship between the State and AEI is alleged or shown in the record. AEI was acting as the State's agent in transporting Paull.

¶37 Florida authorities surrendered Paull to the officers of AEI, who under the allegations of the complaint operated as agents of the State of Montana, for whom Florida was holding the prisoner. The Restatement (Second) Agency provides for liability by a principal who has a duty to protect another from harm caused by its agent.

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others from harm caused to them by the failure of such agent to perform the duty.

Restatement (Second) Agency, § 214. We adopt Restatement (Second) Agency, § 214, as an appropriate statement of the law in Montana.

¶38 We hold that the State had a duty to exercise ordinary care in returning Paull to Montana to answer its probation revocation proceeding. This does not mean that the State may not use a private contractor or other means to transport prisoners like Paull. It does not mean that the State is strictly liable for any injury that results from prisoner transportation regardless of fault. It does mean, however, that if the State chooses to transport prisoners by allowing other entities to do the work, it may be held liable for the tortious acts or omissions of its agents undertaking the transportation. *See Nazareth v. Herndon Ambulance Service*, 467 So.2d 1076 (Fla. App. 1985).

16

¶39    Whether there were acts or omissions of AEI that caused injury to Paull for which the State or County may be liable will have to be determined by further proceedings in the District Court.  For the reasons discussed above, we reverse the District Court's decision to grant summary judgment for the defendants and remand for further proceedings consistent with this opinion.

_____
/S/ MIKE McGRATH

We concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS

Justice James C. Nelson concurs.

¶40    I agree that prisoner transport is inherently dangerous for the reasons set forth in ¶¶ 23-25 of the Court's Opinion.  Importantly, this activity is made all the more dangerous when the government which retains the transporter fails its duty of due diligence to investigate the contractor before hiring.  This duty of due diligence, in my view, encompasses the government's obligation to make sure that the contractor is insured, operates in compliance with applicable federal and state laws and rules, has a good service record, and utilizes employees who are competent, trained and professional—employees who are not burdened with personality traits or mental deficits that predispose them to cruelty and torture.  The government, in fulfilling its own duty to transport prisoners, must not be permitted to hire any fly-by-night or otherwise

unqualified contractor for that purpose. Absolving the government from liability for doing so almost guarantees that, at some point, a prisoner or an innocent member of the public will be injured or killed by the incompetence, gross neglect or misconduct of the contractor and its employees in discharging their duties.

¶41 I cannot agree that, in this case, we are dealing with a simple automobile accident for which there was no fault or for which simple negligence was the cause. Nor do I agree that we are dealing with an accident caused by horseplay, however it might be characterized. Rather, this case involves a contractor whose employees, arguably, intentionally tortured the prisoners in their custody and care. It is alleged that the AEI guards, over an extended cross-country trip, refused to provide their charges with basic needs including adequate bathroom breaks. It is also alleged that the driver of AEI's transporting vehicle intentionally swerved the vehicle so as to cause the prisoners to spill urine on themselves when they were forced by their guards to relieve themselves in whatever containers happened to be available in the back of the van. Opinion, ¶¶ 25-26. That the tragic crash (which resulted in fatal and non-fatal injuries) occurred as an apparent consequence of the van driver's torturous conduct, removes this case from the realm of negligence and horseplay.

¶42 If the facts of this case are as alleged, then the conduct of AEI's employees was little different than the treatment that some prisoners of war have been subjected to over the last decade. If, as a civilized society, we reject the torture of prisoners of war, then most certainly we should reject the torture of prisoners who are placed in custody as a result of the criminal processes of this State. Montana prisoners retain their right to

18

human dignity[1] once taken into custody under the authority and power of the State. The State and its governmental subdivisions must be held to a high standard in dealing with Montana prisoners. Indeed, in *Walker v. State*, 2003 MT 134, 316 Mont. 103, 68 P.3d 872 (a prisoner rights case), we determined that the dignity clause provided Montana prisoners with greater protection from government intrusion than does the United States Constitution. For example, we stated in *Walker*: "[T]reatment which degrades or demeans persons, that is, treatment which deliberately reduces the value of persons, and which fails to acknowledge their worth as persons, directly violates their dignity." *Walker*, ¶ 81 (quoting Mathew O. Clifford & Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont. L. Rev. 301, 307 (Summer 2000)). We also determined in *Walker* that "[t]he plain meaning of the dignity clause commands that the intrinsic worth and the basic humanity of persons may not be violated." *Walker*, ¶ 82. The right of dignity is the only "inviolable" right in the Montana Constitution. The right is self-executing and is absolute. The government must not be permitted to blithely wash its hands of its failure to perform a due-diligence investigation of a prisoner-transport contractor before retaining it for the inherently dangerous task of inter-state prisoner transport. Here, the State and County cannot simply disavow the allegedly appalling treatment of a Montana prisoner under circumstances which the State and County set in motion when it hired AEI with little or no prior due-diligence investigation.

---

[1] A right guaranteed under Article II, Section 4 of the Montana Constitution ("The dignity of the human being is inviolable.").

¶43    I concur.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶44    The Court's opinion today results from a fundamental misunderstanding or misapplication of the "inherently dangerous" activity exception. The opinion disturbs well-settled principles of tort law, has no foundational authority for its conclusions, and simply defies logic. Moreover, with regard to the State, the Court sees fit to redraft the plaintiff's complaint to address issues neither raised nor addressed in either the District Court or before this Court. Such disregard of the appellate rules should not be countenanced. I dissent, and would affirm the judgment entered by the District Court in favor of the County and the State.

¶45    *I. Vicarious Liability of the County for "Inherently Dangerous" Activities*

¶46    The Court declares that "the transportation of prisoners is . . . an inherently dangerous activity." Opinion, ¶ 22. The Court makes this pronouncement without citing any precedential authority. This is so because there is none. The Court's decision not only disregards settled principles of Montana law based upon the Restatement, but is in conflict with every other jurisdiction which has considered this issue. As a consequence, Montana now becomes the first and only state in the United States to impose vicarious liability for the activity of human transport. And, disconcertingly, the Court's broad expansion of the exception is done without any clear test for determining whether an

20

activity is inherently dangerous. This dissent will attempt to succinctly point out the Court's analytical errors.

¶47 *The "Inherently Dangerous" Activity Exception*

¶48 It is well-established that employers are generally not liable for the torts of their independent contractors. *Beckman v. Butte-Silver Bow Co.*, 2000 MT 112, ¶ 12, 299 Mont. 389, 1 P.3d 348 (citations omitted). However, employers may be liable for the intentional or negligent actions of an independent contractor if the activity is inherently or intrinsically dangerous. *Beckman*, ¶ 12. This is so because the employer is aware, at the time of contracting, of the dangers which are "inherent" in the work, and the law therefore requires him to oversee implementation of "special precautions" necessary to "protect workers from the unreasonable, extraordinary, and unusual risks associated with" an inherently dangerous activity. *Beckman*, ¶ 15-26; *Restatement (Second) of Torts* § 416 cmt. a (1965). Critically, the "inherently dangerous" exception applies only when the work itself is dangerous *when skillfully performed*. The Court's decision to the contrary—that work can be considered "dangerous" by assuming it will be *negligently performed*—is contrary to the purpose of the exception and the reasons underlying the rule.

¶49 The "inherently dangerous" exception (coined "intrinsically dangerous") was first recognized in Montana in *Shope v. City of Billings*, 85 Mont. 302, 309, 278 P. 826, 828 (1929) (citing *Dillon on Municipal Corporations* vol. 4, § 1722 (5th ed.); 43 C.J. 947). In *Shope*, the defendant, an independent contractor hired by the city to install a metal oil tank, negligently permitted a cable to sag across a street while he attempted to hoist and

21

set the tank. The plaintiff, driving on the same street, struck the cable and was seriously injured. The Court, recognizing the "inherently dangerous" activity exception, stated that the "rule that the municipality is not liable for the negligence or wrongful acts of a contractor in the execution of the work agreed to be performed 'does not apply where the contract directly requires the performance of a work intrinsically dangerous, *however skillfully performed.*'" *Shope*, 85 Mont. at 309, 278 P. at 828 (emphasis added, citations omitted). However, the case ultimately turned on a critical distinction. The Court found that the City of Billings was *not* vicariously liable because the plaintiff's injury was entirely the result of the independent contractor's *negligent performance* of the work. *Shope*, 85 Mont. at 309-10, 278 P. at 828.

¶50    This Court further explained that important distinction in the inherently dangerous context in *Ulmen v. Schwieger*, 92 Mont. 331, 345-48, 12 P.2d 856, 859-60 (1932), a highway construction personal injury case. In *Ulmen*, the plaintiff sustained serious injury when she drove into an open excavation and against a concrete culvert. *Ulmen*, 92 Mont. at 342-43, 12 P.2d at 857-58. The *Ulmen* Court held the employing party liable for failing to oversee that special precautions were in place, given the "inherently dangerous and hazardous" nature of the activity. The Court again recognized the "obvious difference" between this case and one where "committing work to a contractor to be executed, from which, *if properly done*, no injurious consequences can arise . . . ." *Ulmen*, 92 Mont. at 348, 12 P.2d at 860 (emphasis added) (citing *Bower v. Peate*, 1 Q.B. 321, 326 (1876)).

¶51    Thus, from the beginning of our jurisprudence, the critical component of the inherently dangerous exception has been clear: that a task can be deemed "inherently" or "intrinsically" dangerous where the danger cannot be alleviated by the skillful performance of the task. Negligent performance of a task does not turn it into an inherently dangerous task. *See Chainani by Chainani v. Bd. of Educ. of City of N.Y.*, 663 N.E.2d 283, 287 (N.Y. 1995) ("the activity involved is 'dangerous in spite of all reasonable care'" (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, at 513 (5th ed., West 1984)). Thus, the reliance by the Court and the Concurrence upon the sadistic misconduct of the van driver to find that transport activity is "inherently dangerous" is clearly flawed.

¶52    The exception has only been applied to "cases of demolition, excavation, and other clearly dangerous activities." *Arthur v. Holy Rosary Credit Union*, 656 A.2d 830, 832 (N.H. 1995) (citing *Carr v. Merrimack Farmers Exch.*, 146 A.2d 276, 279 (1958)); *see* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, 512-16 (5th ed., West 1984) (identifying inherently dangerous activities as: excavation, construction, blasting, fireworks, crop dusting, the clearing of land by fire, tearing down high walls or chimneys, the construction of a dam) (collecting cases); *Waite v. Am. Airlines, Inc.*, 73 F. Supp. 2d 349, 357 n. 8 (S.D.N.Y. 1999) ("inherently dangerous activities typically include: blasting, pile driving, certain types of excavations, fumigation of buildings with dangerous gasses such as cyanide, the emission of noxious gasses into densely populated areas, and the collection of large quantities of explosives or inflammable liquids in a populous area") (citations omitted); *Chainani*, 663 N.E.2d at 287 ("[f]amiliar examples of

23

inherently dangerous activities are blasting, certain types of construction and working with high tension electric wires").

¶53 These cases of construction, demolition, excavation, noxious gasses, inflammable liquids and high tension electric wires logically define these rules because they are inherently dangerous even if skillfully performed, the employer knows of the dangers at the time of contracting, and special precautions are required to reduce those certain dangers. Courts, including this Court, have consistently applied the "inherently dangerous" activity exception to some form of construction, destruction or volatile instrumentality. Thus, in *Beckman*, the Court held that trenching was inherently dangerous as a matter of law, given that "requiring workers to enter a trench where they could be buried if a cave-in resulted, requires special precautions." *Beckman*, ¶ 25; *Fabich v. PPL Montana, LLC*, 2007 MT 258, ¶ 36, 339 Mont. 289, 170 P.3d 943.

¶54 Further, we have been careful to point out that §§ 416 and 427 of the Restatement (Second) of Torts are exceptions to "the general rule that employers are not liable for the torts of their independent contractors," and as such should be applied "narrowly." *Beckman*, ¶ 25. Consequently, in both *Cunnington* and *Fabich* we held that scaffolding work was <u>not</u> inherently dangerous, reiterating the *Beckman* rule that "[a]n inherently dangerous activity is one, like large-scale trenching, that requires 'special precautions' to prevent injury or death." *Cunnington v. Gaub*, 2007 MT 12, ¶ 16, 335 Mont. 296, 153 P.3d 1; *see Fabich*, ¶ 36.

¶55 Applying these principles, courts have refused to expand this narrow exception to a broader range of activities, including the transport of humans. The New York Court of

24

Appeals declined to extend the exception to "the activity of transporting children by bus to and from school." *Chainani*, 663 N.E.2d at 287-88. The *Chainani* Court discussed the "inherently dangerous" jurisprudence and its application to such dangerous activities of "blasting, certain types of construction and working with high tension electric wires." *Chainani*, 663 N.E.2d at 287 (citations omitted). In rejecting the argument that the transportation of school children was inherently dangerous, the court reasoned that, "[d]emanding though it may be, the activity of transporting children by bus to and from school—successfully accomplished countless times daily—does not involve that sort of inherent risk for the nonnegligent driver and is simply not an inherently dangerous activity so as to trigger vicarious liability." *Chainani*, 663 N.E.2d at 287. The New York Court's refusal to extend the exception to an activity whose dangerousness is dependent upon the vagaries of human behavior should give the Court concern about its ruling here.

¶56 *The Requirement of Advance Notice of the Danger*

¶57 In addition to being inherently dangerous, the exception requires the employer to be aware of the inherent dangers at the time of contracting. The crux of the Restatement (Second) of Torts, §§ 416 and 427, is "that the risk or danger must be 'recognizable in advance,' *i.e.*, at the time the contract is made, for the doctrine to be invoked." *Bosak v. Hutchinson*, 375 N.W.2d 333, 340 (Mich. 1985) (citations omitted). "Stated another way, the inherently dangerous exception cannot be applied unless a risk inherent in the nature of the procedures is apparent or contemplated by the employer." *Rosenberg v. Eq. Life Assurance Socy. of U.S.*, 595 N.E.2d 840, 844 (1992); *see also McDonald v. Shell Oil Co.*, 228 N.E.2d 899, 901-02 (N.Y. 1967); *McCall v. Ala. Bruno's, Inc.*, 647 So.2d

25

175, 177-79, and n. 12 (Fla. 1994) ("It is sufficient that work of any kind involves a risk, *recognizable in advance*, of physical harm to others which is inherent in the work itself . . . .") (emphasis added, collecting cases); *Arthur*, 656 A.2d at 832 ("The inherent danger doctrine applies only where the alleged danger is 'naturally to be apprehended' by the defendant at the time it engages the independent contractor to perform the work.") (citations omitted).

¶58    Our cases have likewise recognized this concept.  We said in *Ulmen* that "the work was in fact inherently dangerous and hazardous to the public, *and known to be so by the contracting parties*, unless properly guarded."  *Ulmen*, 92 Mont. at 347, 12 P.2d at 859 (emphasis added, citations omitted).  Advance notice, of course, satisfies the concept of foreseeability for purposes of imposing liability on the employer, and demonstrates why an employer cannot be held liable for an independent contractor's collateral negligence in the performance of his duties, even if the activity is inherently dangerous— precisely because the employer cannot foresee such collateral negligence, and cannot be held liable for it.  This principle undergirds the illustration we provided in *Beckman* of which liabilities arising from an inherently dangerous activity could be vicariously imposed upon the employer:

> If a contractor is employed to transport giant logs over the highway, the contractor's employer is not liable for torts caused by the contractor driving in excess of the speed limit.  Speeding is not an unreasonable risk particular to transporting logs, but is an ordinary form of negligence which is usual in the community and the prevention of which requires ordinary or standard precautions.  However, an employer will be vicariously liable for the contractor's failure to take special precautions to anchor the logs to the contractor's truck.  This is because transporting giant logs creates an uncommon hazard that the logs will become disengaged, a hazard not

26

ordinarily encountered in the community which calls for particular precautions to prevent its occurrence.

*Beckman*, ¶ 22 (citing the *Restatement (Second) of Torts* § 416 cmt. d (1965)). The employer is not liable for the negligence or recklessness of the independent contractor, *i.e.*, speeding or failing to inspect the brakes, because he was not aware of those dangers at the time he contracted the work away. *Beckman*, ¶¶ 22-26. Employers cannot be expected to know the unforeseeable negligent, reckless, wanton or intentional tortious conduct of independent contractors at the time of contracting. Rather, the employer is liable only for those torts which arise from the "peculiar" or "unreasonable risks" which are "caused by" the dangerous activity, because *he was aware of them* when he contracted away the work. *Beckman*, ¶ 22; *see Shope*, 85 Mont. at 309-10, 278 P. at 828; *Ulmen*, 92 Mont. at 346-48, 12 P.2d at 859-60. Here, the Court requires an employer to assume that an employee of its independent contractor will engage in misconduct and to take special precautions to prevent that possibility.

¶59    *Application of the Law to Paull's Case*

¶60    The Court today obliterates 80 years of our caselaw applying the exception, beginning with *Shope* through *Beckman* and recently in *Fabich*, and rejects over 100 years of national jurisprudence, *Bower*, 1 Q.B. 321 (1876), including the rules of the Restatement and the decisions of many courts who have considered this issue. Under these authorities, the Court's conclusion that the risk of driver misconduct is an inherent danger arising from the enterprise of prisoner transportation for which the employer should have known and taken precautions is simply untenable.

¶61 First, prisoner transportation does not involve construction, destruction or some form of inherent volatile or dangerous instrumentality, like dynamite or trenching. It involves control over human beings. It is axiomatic that the nature of dynamite is to blow up, and that special precautions are necessary to evacuate people, protect workers, etc. The nature of trenching is for the ground to collapse after giant holes have been dug in the earth, and special precautions, like "sloping the banks of a trench, mechanically shoring a trench bank, or using a trench box" are necessary. *Beckman*, ¶ 23. The Court believes that the nature of a prisoner is that he will be "more likely to become aggressive and hostile and more likely to attempt escape or engage in other dangerous activities." Opinion, ¶ 25. However, dynamite is not "more likely" to blow up; it just does. The point is that human beings do not have an absolute nature that an employer can predict, unlike dynamite. An employer should not be required to assume either that a prisoner will act out or that the contractor's employee will engage in sadistic horseplay.

¶62 Here, the County could not have possibly foreseen the driver's alleged misconduct toward the prisoners when it contracted with AEI. The Court faults the County for knowing what it could not have possibly known—that AEI would employ a driver who would engage in misconduct, or, in the words of the Concurrence, was "burdened with personality traits or mental deficits that predispose [him] to cruelty and torture." Concurrence ¶ 1. There were no "special precautions" the County could have taken to prevent what occurred in this case, except hiring a different contractor who did not employ sadistic drivers—and this point underscores the error of the Court's Opinion and the Concurrence.

28

¶63 Paull could well have asserted other claims to properly hold the County responsible. Paull could have asserted that the County negligently hired AEI as an independent contractor. *See Gurnsey v. Conklin Co., Inc.*, 230 Mont. 42, 751 P.2d 151 (1988); *Restatement (Second) of Torts* § 411 (1986). Indeed, this is the actual basis for liability advocated by the Concurrence, that the County "fail[ed] its duty of due diligence to investigate the contractor before hiring . . . to make sure that the contractor is insured, operates in compliance with applicable federal and state laws and rules, has a good service record, and utilizes employees who are competent, trained and professional." Concurrence, ¶ 1. The Concurrence thus makes out a negligent hiring claim on behalf of Paull—but not a claim for vicarious liability.

¶64 Plaintiff's complaint alleged that the rollover accident at issue here occurred because "the driver, Steven Mendoza, was laughing as he repeatedly turned the steering wheel quickly to the left and to the right thereby causing the urine to spill out of the cups and all over the prisoners [and] then failed to maintain his lane of travel, and drifted into the median then overcorrected . . . ." There is nothing in the record to suggest that an inherent risk of prisoner transport—i.e., attempted escape, assault by a prisoner on the driver or another prisoner, or prisoner activity of any sort—caused or contributed to this unfortunate accident. Under questioning during oral argument, Plaintiff's counsel admitted the obvious—that the driver's actions here did not constitute a risk which is inherent in the transportation of prisoners. However, the Court closes its eyes to the obvious in order to reach the result it desires.

29

¶65 The Court has greatly expanded vicarious liability, on no authority and little to no guidance for future cases. In holding that prisoner transportation is inherently dangerous, arguably any activity can now be inherently dangerous, as long as some dangerous possibilities can be conjured up and "special precautions" imagined. This holding will expose contracting employers to liability for virtually every negligent or intentional tort committed by the independent contractor. The exception—once promised to be "narrow"—has now swallowed the rule. Justice Gray's special concurrence in *Beckman*, warning that we not "allow the exceptions to swallow the general rule," has now been realized. *Beckman*, ¶ 46 (Gray, J., concurring). I would affirm the judgment for the County.[1]

¶66 *II. The Ostensible Agency Claim Against the State*

¶67 I would also affirm summary judgment in favor of the State. The Court states that "[t]he District Court considered but rejected Paull's argument that the State had a duty to transport him safely and humanely." Opinion, ¶ 33. Not true. Paull not only failed to

---

[1] Clear guidance for the dissent's position is provided by the Restatement (Second) of Torts, §§ 416 and 427, used interchangeably, which stand for the proposition that "the employer remains liable for injuries resulting from dangers which he should contemplate at the time that he enters into the contract, and cannot shift to the contractor the responsibility for such dangers, or for taking precautions against them." *Restatement (Second) of Torts* § 416 cmt. a. The Restatement comments further explain that § 416 is more commonly applied "where the employer should anticipate the need for some specific precaution, such as a railing around an excavation in a sidewalk," while "§ 427 is more commonly applied where the danger involved in the work calls for a number of precautions, or involves a number of possible hazards, as in the case of blasting, or painting carried on upon a scaffold above the highway." Section 427 makes clear that the employer who employs an independent contractor to complete work involving an inherent danger to others "which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract," shall be liable for the harm caused by the independent contractor. *Restatement (Second) of Torts* § 427.

30

*argue* to the District Court, in either written or oral arguments, that the State had a non-delegable duty, he, more importantly, did not *allege* it in his complaint. His complaint did not mention either "duty" or "contract," let alone state a claim that the State had entered an independent contractor relationship with AEI creating contractual duties of the State which should be declared non-delegable. The Court offers that the issue was referenced in a discovery disclosure, but a discovery answer cannot preserve a claim or theory not pled or otherwise presented to the district court.

¶68    "The general rule in Montana is that this Court will not address either an issue raised for the first time on appeal or a party's change in legal theory." *Unified Indus., Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, 961 P.2d 100 (citing *Day v. Payne*, 280 Mont. 273, 276, 929 P.2d 864, 866 (1996)); *see Akhtar v. Van de Wetering*, 197 Mont. 205, 209, 642 P.2d 149, 152 (1982) ("[a]n issue which is presented for the first time to the Supreme Court is untimely and cannot be considered on appeal"). This rule "applies to both substantive and procedural matters, as well as to a change in a party's theory of the case." *Day*, 280 Mont. at 276, 929 P.2d at 866. The Court in *Day* explained the principle:

> [I]t is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. Furthermore, it is unfair to allow a party to choose to remain silent in the trial court in the face of error, taking a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable.

*Day*, 280 Mont. at 277, 929 P.2d at 866 (citing 5 Am. Jur. 2d *Appellate Review* § 690 (1995)).

31

¶69    The Montana cases regarding preservation of an issue for appellate review are legion.  *See Spencer v. Robertson*, 151 Mont. 507, 445 P.2d 48 (1968) (Supreme Court will consider for review only those questions raised in trial court); *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 54 P.3d 38 (the Court has consistently held that it will not consider issues raised for the first time on appeal) (collecting cases); *Anderson v. Monforton*, 2005 MT 310, ¶ 30, 329 Mont. 460, 125 P.3d 614 ("Since this argument is raised for the first time on appeal, we do not address it." (citing *State v. Weaselboy*, 1999 MT 274, ¶ 16, 296 Mont. 503, 989 P.2d 836)).

¶70    Paull's failure to assert a claim that the State had a non-delegable duty arising out of an independent contractor relationship with AEI deprived the State of its ability to respond, deprived the District Court of its ability to consider the issue, and accordingly failed to preserve such a claim for appeal.  Apparently, the appellate rules are of no consequence to the Court.

¶71    The Court has essentially rewritten the Plaintiff's complaint to set forth a claim against the State which the Plaintiff did not make for himself, a violation of long-held tenets of appellate review.  "[I]t is not this Court's obligation to conduct legal research on appellant's behalf, to guess as to his precise position, or to develop legal analysis that may lend support to his position." *Pankratz Farms, Inc. v. Pankratz*, 2004 MT 180, ¶ 82, 322 Mont. 133, 95 P.3d 671 (quoting *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295

32

Mont. 89, 983 P.2d 339).  By so doing, the Court violates its duty to be neutral and impartial to all parties who appear before the Court.[2]

¶72    The Plaintiff's claim against the State, to the extent the complaint's intentions could be discerned at all,[3] was premised upon a vague agency theory, as set forth in a single sentence: "the defendant Park County, Montana was acting as the agent for and on behalf of and at the request of the State of Montana."  Even accepting *arguendo* that this sufficiently pled a claim based upon agency, the Plaintiff nonetheless decided, on appeal, to make a non-delegable duty argument instead, and failed to argue his agency theory in his briefing to this Court.  "A party may not raise new arguments or change its legal theory on appeal because it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider." *State v. Morrison*, 2008 MT 16, ¶ 10, 341 Mont. 147, 176 P.3d 1027 (citations omitted).  The Plaintiff ultimately preserved no claim whatsoever against the State in this case.  However, this is of no import to the Court, which doesn't even mention these issues, despite the explanation of them given by the State's counsel during oral argument.  The message given here is that rules of appellate review do not apply if the Court feels strongly enough about reaching an issue.  If necessary, the Court will even rewrite the plaintiff's complaint to do so.

---

[2] On appeal, the Plaintiff offers for the first time a non-delegable duty argument against the State, premised upon a "special relationship" theory.

[3] Defense counsel argued to the District Court that "we were trying to figure out [] what theory the complaint made against the State of Montana . . . .  It was a puzzle to look at that complaint and try to find a connection between the allegations of the complaint and the conduct of the State of Montana . . . ."  Hrg. Transcr. 22:24–23:3 (Nov. 5, 2007).

¶73 Because I believe the Court's decision to reach these issues is error, I will not analyze at length the substance of the Court's holding that AEI was an ostensible agent of the State as to Paull. I only note that the Court's ruling in this regard is made as a matter of law, without regard to the factual issues that we have held must be resolved in order to establish ostensible agency. "[O]ur ostensible agency statute focus[es] on the action or inaction of the putative principal which caused the third person to believe an employment relationship existed, and the reasonableness of the third person's corresponding belief." *Butler v. Domin*, 2000 MT 312, ¶ 39, 302 Mont. 452, 15 P.3d 1189.

¶74 I would affirm the District Court's judgment in favor of both the County and the State. I dissent.

/S/ JIM RICE

Justice W. William Leaphart, concurring in part and dissenting in part.

¶75 I concur with the Court's resolution of issue two. As to issue one, I concur with the Court's conclusion that the transportation of prisoners is an inherently dangerous activity. Opinion, ¶ 22. To the extent that Justice Rice concludes that driver misconduct is not, however, one of the dangers "inherent" in the transportation of prisoners, I agree with his dissent.

/S/ W. WILLIAM LEAPHART