JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 Appellants appeal from the grant of summary judgment to William Andersen. We affirm.
¶2 We address the following issues on appeal:
¶3 1. Whether Andersen’s deed indicates that he does not own the land adjacent to his property between the high-water and low-water lines.
¶4 2. Whether Andersen is bound by the prior quiet title decree adjudicating McCollum, LLC, as the owner of the disputed property.
*464 ¶5 3. Whether certain portions of Appellant’s Reply Brief should be stricken.
FACTUAL AND PROCEDURAL BACKGROUND
¶6 Respondent William Andersen and Appellants Doug and Valerie McCollum are neighbors. Appellants McCollum, LLC, Jefferson River Ranches, LLC, and Jefferson River Ranches Homeowners’ Association, Inc., are all entities established by the McCollum family. This appeal arises from a dispute over who owns an 11.14 acre tract of land to the north of Andersen’s property that sits between the high-water line (the bank of the Jefferson River) and the low-water line. Both Andersen and the McCollums claim ownership of the property.
¶7 Although a long line of land transfers preceded this dispute, for our purpose, the first relevant transaction took place in 1971. At this time, Taylor and May Hale granted to Remi Monforton, a present appellant, and his wife, Betty Jo, Sections 15 and 22 of the Hale Ranch in Madison County, Montana, by warranty deed, described as follows:
That certain tract of land situated in the West 1/2 of Section 22, and the SW 1/4 of Section 15, T. 1 N., R. 4 W., M.P.M. Madison County, Montana, being more particularly bounded and described as follows, to wit: Commencing at the comer common to Sections 21, 22, 27 and 28, T. 1 N., R. 4 W., M.P.M., Madison County, Montana, a brass cap monument; thence N. 00° 07' 26" W. a distance of 79.75 feet on and along the section line between Sections 21 and 22 to the Point of Beginning, a point on the North right-of-way line of a county road; thence continuing N. 00° 07' 26" W. a distance of 651.25 feet to a point on the right hank of the Jefferson River; thence meandering the right hank of the Jefferson River N. 62° 17' 28" E. a distance of 255.93 feet; N. 87° 55’ 03" E. a distance of 275.18 feet; N. 39° 56' 45" E. a distance of 521.75 feet; N. 33° 18' 38" E. a distance of 209.40 feet; N. 28° 59’ 45" E. a distance of474.47 feet; N. 39° 29' 28" E. a distance of 699.73 feet; No. 44° 33' 45" E. a distance of 463.17 feet; N. 12° 48’ 15" E. a distance of225.61 feet; due North a distance of225.00 feet; N. 34° 22' 49" W. a distance of 115.11 feet; N. 14° 02’ 10" W. a distance of 247.39 feet; N. 33° 01' 26" W. a distance of 119.27 feet; N. 30° 57' 50" W. a distance of 349.86 feet; N. 31° 25' 46" W. a distance of 316.43 feet; N. 20° 36' 54" W. a distance of 97.00 feet; N. 21° 02' 15" W. a distance of 336.65 feet; N. 34° 22' 49" W. a distance of 115.11 feet; N. 06° 50' 34" W. a distance of 251.79 feet; N. 05° 56' 49" E. a distance of281.22 feet to the point of curvature of a curve *465 to the right having a radius of 210.00 feet; thence on and along said curve a distance of 321.06 feet; thence S. 86° 27' 19" E. a distance of 159.35 feet to the point of curvature of a curve to the left having a radius of 340.00 feet; thence on and along said curve a distance of369.47 feet to the point of reverse curve of a curve to the right having a radius of 169.01 feet; thence on and along said curve a distance of 334.24 feet; thence S. 35° 24' 25" E. a distance of 104.08 feet to the point of curvature of a curve to the left having a radius of 170.00 feet; thence on and along said curve a distance of243.82 feet; thence N. 62° 25' 05" E. a distance of 152.22 feet to the intersection with the north-south mid-section line of Section 15, T. 1 N., R. 4 W., M.P.M.; thence leaving the right hank of the Jefferson River on and along said north-south mid-section line of Section 15, S. 00° 26’ 49" E. a distance of 198.75 feet to the one-quarter comer common to Sections 15 and 22, T. 1 N., R. 4 W., M.P.M., abrass cap monument; thence S. 00° 21' 34" E. a distance of 2985.33 feet on and along the north-south mid-section line of Section 22, to the intersection with the north right-of-way line of a county road; thence on and along said right-of-way line S. 62° 12' 12" W. a distance of 3.83 feet; thence S. 51° 19' 22" W. a distance of 230.63 feet; thence S. 30° 22' 05" W. a distance of 313.79 feet; thence S. 36° 04' 00" W. a distance of 697.76 feet; thence S. 42° 15' 58" W. a distance of281.23 feet; thence S. 53° 53' 30" W. a distance of 533.42 feet; thence S. 55° 12' 19" W. a distance of 555.43 feet; thence S. 55° 26' 50" W. a distance of 583.96 feet; thence S. 63° 17' 28" W. a distance of 153.34 feet; thence S. 89° 57' 30" W. a distance of 204.74 feet to the Point of Beginning, said tract of land containing 123.745 gross acres, the net platted area being 120.714 acres. [See attached Map A.] [Emphasis added.]
¶8 The Monfortons divided this tract of land sitting on the south bank of the Jefferson River in order to sell residential lots-thus, creating the Box Lazy L Ranches Subdivision. The Monfortons had the subdivision surveyed by James Spring, instructing him to survey lots all the way to the Jefferson River; they then filed the Certificate of Survey with the Madison County Clerk and Recorder. The Monfortons sold Lots 15,16,17, and 18 to the Gilberts, who in turn sold those lots to Andersen in 1980 and 1987. Lots 16, 17, and 18 sit on the south shore of a bend in the Jefferson River. The disputed property consists of 11.14 acres of land sitting between the high-water line (the river bank) and the low-water line.
*466 ¶9 Eventually, the Monfortons sold the remainder of the original ranch, excepting out various properties, including Andersen’s tracts. This remainder of land, located to the east of Andersen’s property, then went through a series of owners, until Valerie McCollum acquired it in 1995. McCollum then conveyed the land to Appellant McCollum, LLC.
¶10 In 1999, McCollum, LLC, hired a surveyor, Donald Schauber, to survey and subdivide property in order to adjust a boundary with some neighbors, the Wisners. Schauber prepared Certificate Survey No. 1349-AE, showing property belonging to McCollum, LLC, as Tract B, and the land to the east owned by the Wisners, as Tract A. (See attached Map B.) Andersen’s land sits to the west of the McCollum property. According to Schauber’s survey, Tract B encompasses (in addition to land of no concern to Andersen) the disputed 11.14 acres north of Andersen’s Lots 16, 17, and 18-that is, the land between the high-water line and the low-water line on the south shore of the Jefferson River. In creating the survey, Schauber looked to the original description (from the Hales to the Monfortons), which he interpreted as granting Andersen a fixed boundary on the north side of Andersen’s property along the high-water line. Andersen knew nothing of Schauber’s survey at the time it was commissioned, and believed he owned the 11.14 acres that Schauber interpreted as belonging to McCollum, LLC. McCollum, LLC, on the other hand, claims it owned the 11.14 acres before commissioning Schauber’s survey and therefore did not find it necessary to take action against Andersen to acquire title to the land.
¶11 McCollum, LLC, hired an examiner to research and determine if title problems existed with Schauber’s survey of the land depicted in Certificate Survey No. 1394-AE. The examiner discovered a title problem with a small triangle-shaped piece of property that did not include the disputed 11.14 acres. Upon the examiner’s recommendation, the McCollums and the Wisners brought a quiet title action against Ted Dow Lewis and Delta H. Lewis over the small triangle-shaped land. Again, this land did not include the disputed 11.14 acres. According to the McCollums, they did not take action with regard to the disputed 11.14 acres because of their belief that they already owned the land.
¶12 The title action for the triangle-shaped piece of land did not name Andersen, nor was he served. After performing a “diligent search and inquiry” for all possible defendants, the McCollums and the Wisners served notice of the summons and complaint to all unknown *467 defendants through publication in the Madisonian, a newspaper published in Madison County, Montana, for five consecutive weeks. Andersen claims to have been ignorant of this quiet title action-until the advent of the present litigation. The District Court entered a judgment and decree quieting title to the property described in Certificate of Survey No. 1349-AE to McCollum, LLC, and the Wisners. This property included Tract B, encompassing the disputed 11.14 acres.
¶13 The legal description of the Box Lazy L Ranches Subdivision, as quoted above, describes the high-water line as the boundary of Lots 16, 17, and 18. The legal description of the remainder of the original ranch, ever since it was sold by the Monfortons, has included an identical description of the southern boundary between the ranch and Lots 16, 17, and 18. In 2000, claiming ownership of the 11.14 acres, McCollum, LLC, conveyed Tract B to Appellant Jefferson River Ranches, LLC, which then in turn conveyed Tract B to Jefferson River Ranches Homeowners’ Association, Inc.
¶14 Andersen brought suit against Appellants claiming ownership of the disputed land. The District Court held that a meander line defines Andersen’s property, and therefore he owns the 11.14 acres in dispute. The court granted summary judgment in favor of Andersen.
STANDARD OF REVIEW
¶15 We review a grant of summary judgment de novo. We apply the same criteria as the district court according to Rule 56, M.R.Civ.P. Rolison v. Bozeman Deaconess Health Services, Inc., 2005 MT 95, ¶ 13, 326 Mont. 491, ¶ 13, 111 P.3d 202, ¶ 13. Summary judgment shall be granted if the evidence filed with the court “show[s] no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.” Rolison, ¶ 13.
DISCUSSION ISSUE ONE

Whether Andersen’s deed indicates that he does not own the land adjacent to his property between the high-water and low-water lines.

¶16 Andersen and the McCollums (via their entities) claim ownership to the 11.14 acre stretch of land sitting between the high-water and low-water lines of the Jefferson River, just north of Andersen’s property and northwest of the McCullom property. The District Court’s summary judgment opinion held that a meander line defines *468 Andersen’s property, and that he therefore owns the 11.14 acres in dispute. We agree with the District Court.
¶17 Before addressing the lower court’s conclusion regarding the facts of this case, we must first address the definition and purpose of “meander lines.”
¶18 Black’s Law Dictionary states:
Meander lines. Lines run in surveying particular portions of the public lands which border on navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows that the water-course, and not the meander line as naturally run on the ground, is the boundary.
Black’s Law Dictionary 980 (6th ed. 1990) (emphasis added).
¶19 In other words, a surveyor utilizes a meander line when he or she wants to show that the navigable river serves as the property boundary. If a meander line does not appear in the description, the boundary is fixed-i.e., it does not alter with the river’s shifting bank.
¶20 The use of meander lines has been the cause of some debate over the years. In the 1868 case, Railroad Company v. Schurmeir (1868), 74 U.S. 272, 7 Wall. 272, 19 L.Ed. 74, the Supreme Court was forced to address the meaning and purpose of meander lines in response to a dispute over whether the described boundary was fixed or dependent on the river’s edge. Even though the description included a meander line, counsel for the railroad company argued that the property had a fixed boundary because the description included metes and bounds. Schurmeir, 74 U.S. at 278. The Court disagreed, holding that “the river ... not the meander-line, is the boundary of the lot...” Schurmeir, 74 U.S. at 286. The Court explained that “[m]eander-lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream.” Schurmeir, 74 U.S. at 286-87. Meander lines, according to the Court, are a “means of ascertaining the quantity of the land in fraction subject to sale, and which is to be paid for by the purchaser.” Schurmeir, 74 U.S. at 287. In other words, while meander lines contain specific measurements, permitting an exact quantity of land to be determined for sale, they are meant to define the boundary as moving with the river’s shifting bank.
¶21 The Ninth Circuit noted several decades later in United States v. *469 Boynton (9th Cir. 1931), 53 F.2d 297, 298, that “a meander line, as carried into field notes, shows corners, posts, monuments, and courses.” The Circuit went on to hold that such a survey line does not become “definite and fixed” unless the drafter took some action or used words “in the instrument of conveyance, which will show that the grantor has agreed that such line shall be considered as having more than its assigned character; it must be agreed that it indicates a definite boundary.” Boynton, 53 F.2d at 298. Citing Boynton as precedent, the Ninth Circuit held in City of Los Angeles v. Borax Consolidated Limited (9th Cir. 1935), 74 F.2d 901, 902, that even though the plat “did not distinctly state that the lines of the patent were meander lines,” it was clearly inferable from the description.
¶22 This Court long ago recognized that “[t]he general rule adopted by state and federal courts is that meander lines run in surveying fractional portions of the public lands bordering upon navigable bodies of water are not run as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the lake or river .... The title of the grantee is not limited to such meander lines; the waters themselves and not the meander line constitute the real boundary." Faucett v. Dewey Lumber Co. (1928), 82 Mont. 250, 257, 266 P. 646, 648 (citations omitted; emphasis added). The same is true regarding meander lines describing non-navigable bodies of water, except that then ownership extends to the middle of the stream, not just to the low-water fine. Bode v. Rollwitz (1921), 60 Mont. 481, 491, 199 P. 688, 691.
¶23 In addition to the above relevant law, we find a 1992 decision from the Texas Court of Appeals useful:
[T]he surveyor may run a meander line, a series of course and distance calls which follow the river or other natural object or monument as closely as is practically possible for purposes of calculating the amount of land conveyed. When a meander line is used, however, the natural object or monument (e.g., a river, the seashore, or an identifiable terrain feature) will control over the specific calls for course and distance. Thus, meander lines of surveys of land adjacent to or bounding upon a stream are not to be considered as boundaries, but they are to follow the general course of the stream, which in itself constitutes the real boundary. ... Where the natural object is clearly referred to in the patent or deed as a boundary of the land conveyed, specific course and distance calls will be construed to be a meander fine.
Texas v. Brazos River Harbor Navigation District (Tex. Ct. App. 1992), *470 831 S.W.2d 539, 542-43.
¶24 Appellants argue that these interpretations of meander lines only apply to government surveys, and that in private surveys meander lines raise only a presumption. However, after considering relevant precedent, we find the rule to apply to both government and private surveys. The Pointe, LLC v. Lake Mgmt. Ass’n, Inc. (Tenn. Ct. App. 2000), 50 S.W.3d 471, 477 (quoting Holbert v. Edens (1880), 73 Tenn. 204, 209-10) (“‘The general rule undoubtably is that a call for the stream or bank... and then with the stream according to its meanders, will carry the boundary ad filurn aquae [to the thread of the stream], whether the grant be by the State or a private individual”’); Ford v. Butte County (Cal. App. Ct. 1944), 145 P.2d 640, 643-44 (stating that rules applying to meander lines in government surveys also apply to private surveys).
¶25 Before addressing the facts of this case, we note the following relevant Montana statutory law:
70-16-201. Owner of land bounded by water. Except where the grant under which the land is held indicates a different intent, the owner of the land, when it borders upon a navigable lake or stream, takes to the edge of the lake or stream at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream.
In other words, Montana statute dictates that property between the low-water line and the high-water line belongs to the party owning property to the high-water line, unless a grant specifically indicates otherwise.
¶26 Turning to the facts of this case, the legal description of Andersen’s property references the Jefferson River bank three times to define the boundaries of the course and distance calls, and characterizes the border as “meandering.” The surveyor defined the boundary as running “... to a point on the right bank of the Jefferson River-, thence meandering the right hank of the Jefferson River ... [series of calls and distances] thence leaving the right bank of the Jefferson River.” As noted above, Montana statute dictates that unless the grant indicates a different intent, the owner of land bordering upon a navigable stream, takes to the edge of the stream at low-water line. Section 70-16-201, MCA. As we noted from previous case law, the use of metes and bounds in the description does not indicate an intent contrary to the statutory presumption of low-water line.
¶27 Given that the deeds describing and conveying Lots 16, 17, and 18 refer to the plat, and given that the plat uses meander lines, we *471 determine that Andersen owns the disputed 11.14 acres at issue here that is adjacent to Lots 16,17, and 18 between the high-water and low-water lines of the Jefferson River. The deeds and the plat do not “indicate” a contrary intention of the grantor. Section 70-16-201, MCA.
¶28 Appellants’ arguments to the contrary are not persuasive. First, Appellants argue that when the land outside of a meander line is greatly in excess of the land covered by a grant the meander line will be treated as the boundary. This rule does not apply here, however, because the acreage of Lots 16, 17, and 18 is larger than the disputed land. In addition, Appellants contend that when boundaries are determined by location, and not monument, courses and distances control. The problem with this argument is that the references to the Jefferson River in the plat illustrate that the boundaries are, at least in part, determined by monument. See Sowerwine v. Nielson (Wyo. 1983), 671 P.2d 295, 299 (“a ‘monument’ is a natural or artificial physical object on the ground which helps establish a line. Natural monuments are such things as trees, rivers, stone outcroppings, creeks, and land features”).
¶29 In addition, Appellants also cite to the depositions of various parties, including Remi Monforton, the original grantor of the subdivision, in support of their argument that the intention of the grantor was to set a “definite boundary” for the property and not use the river as the boundary. Appellants also contend that Andersen has not paid property taxes on the disputed property, while the McCollums have. However, § 70-16-201, MCA, does not allow consideration of evidence outside of the four comers of the granting document. In applying the statute, we must confine our review to the “grant under which the land is held.” Since we have determined that “the grant under which the land is held” does not indicate an intention contrary to granting Andersen the land below the high-water fine, the extrinsic evidence is irrelevant. Tester v. Tester, 2000 MT 130, ¶ 25, 300 Mont. 5, ¶ 25, 3 P.3d 109, ¶ 25 (citing Ferriter v. Bartmess (1997), 281 Mont. 100, 103, 931 P.2d 709, 711) (“[a]n unambiguous deed must be interpreted according to its language as written, without resort to extrinsic evidence of the grantor’s intent”).
¶30 Appellants further argue that some of the property in dispute was created through avulsion occurring since the time the land was surveyed and that, as a result, Andersen does not hold title to the property. Since this argument is raised for the first time on appeal, we do not address it. State v. Weaselboy, 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16.
*472 ISSUE TWO
¶31 Whether Andersen is bound by the prior quiet title decree adjudicating McCollum, LLC, as the owner of the disputed property.
¶32 The District Court concluded that Andersen was not bound by the prior quiet title decree concerning Tract B because Andersen was never properly served, and thus the court in the prior action lacked jurisdiction over him. We agree with this conclusion.
¶33 Andersen may collaterally attack the decree if he was not properly served. Joseph Russell Realty Co. v. Kenneally (1980), 185 Mont. 496, 501, 605 P.2d 1107, 1110. Appellants contend that Andersen was properly served by publication. Under § 70-28-104, MCA, an “unknown claimant” may be joined as a defendant in a quiet title action. However, under § 70-28-107, MCA, service of such a defendant must comply with Rule 4, M.R.Civ.P. Rule 4(D)(5)(c), M.R.Civ.P., governs service by publication upon unknown claimants. It requires that an affidavit be filed that states:
[T]he affiant has made diligent search and inquiry for all persons who claim, or might claim any right, title, estate, or interest in, or lien, or encumbrance upon, such property, or any thereof, adverse to plaintiffs ownership, or any cloud upon plaintiffs title thereto, whether such claim or possible claim be present or contingent... and that the affiant has specifically named as defendants in such action all such persons whose names cam be ascertained ....
¶34 In the quiet title action at issue here, the affiant was the McCollums’ attorney. The attorney stated that he had made a “diligent search and inquiry’ for all possible claimants to Tract B. The requirement for a “diligent search and inquiry’ is not a mere formality but one that requires strict compliance. See Joseph Russell, 185 Mont. at 502, 605 P.2d at 1110 (discussing service by publication upon corporations). As stated above, Andersen’s lots are directly to the west of the McCollums’, and it is undisputed that Andersen’s land borders on Tract B. It is also undisputed that at the time of the action, the McCollums knew Andersen and that they could see Andersen’s house from their property. The McCollums did not inspect Andersen’s property in preparing to quiet title, but instead asked a title company to inquire into what parties they should name in the action. Andersen did not learn of the action until after he filed the present lawsuit.
¶35 Appellants argue that the McCollums did not specifically name, and personally serve, Andersen because they had no way of knowing that Andersen had a claim to part of Tract B. The District Court held that the McCollums should have known of the claim *473 because the deed to Andersen’s property is a matter of public record. Appellants contend that the McCollums could not have known that Andersen’s deed would be interpreted to give him ownership of the disputed 11.14 acres. However, Rule 4, M.R.Civ.P., does not require “knowledge” of ownership but merely knowledge that a “possible claim be present or contingent.” Given the language of Andersen’s deed and of the subdivision’s recorded plat, as well as the McCollums’ knowledge of Andersen’s proximity to Tract B, we affirm the District Court’s conclusion that the McCollums did not perform a “diligent search and inquiry for all persons who claim, or might claim” a right to land within Tract B. Therefore, service by publication was not sufficient service with which to gain personal jurisdiction over Andersen and he is not bound by the prior decree. Fonk v. Ulsher (1993), 260 Mont. 379, 383, 860 P.2d 145, 147 (“[ijmproper service undermines a court’s jurisdiction, and a default judgment subsequently entered is thereby void”).
¶36 Appellants argue that Brown v. Tintinger (1990), 245 Mont. 373, 801 P.2d 607, overruled on other grounds by Wareing v. Schreckendgust (1996), 280 Mont. 196, 205-06, 930 P.2d 37, 43, compels a different result, but that case is distinguishable. There, the defendants had not been named or personally served in a previous quiet title action. The decree in the previous action extinguished an easement the defendants claimed to have held. Brown, 245 Mont. at 376, 801 P.2d at 608. We concluded that there was no evidence that the party who had brought the quiet title action would have known of the defendants’ use of the property. Brown, 245 Mont. at 376, 801 P.2d at 609. In contrast to a claim of an easement, Andersen’s claim is to ownership of the land. Further, there is ample evidence that the McCollums had reason to know of Andersen’s possible claim to the property.
ISSUE THREE
¶37 Whether certain portions of Appellant’s Reply Brief should be stricken.
¶38 After the close of briefing, Andersen moved that certain portions of Appellant’s Reply Brief be stricken because it makes references to facts not in the record and makes arguments which are misstatements and mischaracterizations of Andersen’s arguments. Given that we have held for Andersen on all issues, we determine that we need not address Andersen’s motion.
*474 CONCLUSION
¶39 We affirm the judgment of the District Court.
CHIEF JUSTICE GRAY, JUSTICES NELSON, COTTER and WARNER and DISTRICT JUDGE SHERLOCK, sitting for JUSTICE MORRIS concur.
[[Image here]]
*475 [[Image here]]