FILED

12/12/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0160

DA 17-0160

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 305

BRENDA M. ASH, INDIVIDUALLY and as
Trustee of the Brenda M. Ash Revocable Trust,

      Plaintiff and Appellee,

   v.

JOHN B. MERLETTE, Individually and as
Trustee of the John B. Merlette, Sr. Living Trust;
GLADYS A. MERLETTE, Individually and as
Trustee of the Gladys A. Merlette Living Trust,

      Defendants and Appellants.

APPEAL FROM:   District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No. DV-15-1043B
                Honorable Robert B Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Paul A. Sandry, Johnson, Berg, & Saxby, PLLP; Kalispell, Montana

      For Appellees:

          Renee L. Coppock, Crowley Fleck PLLP; Billings, Montana

          Richard W. Casey, Ashley A. Di Lorenzo, Crowley Fleck PLLP;
          Kalispell, Montana

                      Submitted on Briefs:  August 2, 2017

                              Decided:  December 12, 2017

Filed:

                              _____
                                      Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 John B. Merlette and Gladys A. Merlette (Merlette) appeal an order of the Montana Eleventh Judicial District Court granting summary judgment declaring that Brenda M. Ash (Ash) owns certain disputed land between the high- and low-water marks of a small lake located in Flathead County, Montana. We affirm and address the following issue on appeal:

*Did the District Court correctly conclude that Ash owns the land bordering her property between the high- and low-water marks of Parker Lake?*

## BACKGROUND

¶2 In 1986, Larry and Serena Streeter (Streeters) acquired approximately 43 acres of property surrounding a small lake in Flathead County known as Parker Lake No. 1.[1] In 1991, Streeters subdivided the property by internal boundary line relocation into an approximately 5.66 acre tract (Parcel A) and a 37.17 acre remainder (Tract 1).[2] Both tracts included lake frontage on Parker Lake. In 1992, Streeters sold the 37.17 acre remainder to John Bradshaw (Merlette Property)[3] but retained the previously created 5.66 acre tract (Ash Property) for themselves. In 2000, Brenda Ash (formerly Olson) jointly acquired the Ash Property with her then-husband via a mesne conveyance originating from Streeters.[4]

---

[1] See Tract 1 and Parcel A, COS 10120, filed March 1991, Flathead County real property records.

[2] Certificate of Survey 10404, filed December 5, 1991, Flathead County real property records.

[3] *Inter alia*, the 1992 Bradshaw deed included language expressly reserving "unto" Streeters "lifetime fishing and boating rights and privileges" to Parker Lake, "including access to exercise said boating rights and privileges."

[4] In 2001, Merlette sold .66 acres of the original 37.17-acre tract to Olson-Ash to resolve a mistaken septic system drain field encroachment. COS 14886, Flathead County real property records.

¶3     As created and particularly described by Streeters' 1991 COS 10404, the 5.66 acre Ash Property included approximately 577 feet of frontage on Parker Lake.  COS 10404 described the Ash Property boundary along Parker Lake by a particularized metes and bounds plot running from a referenced starting point on the high-water mark and then "on and along" the high-water mark three specified courses marked by pin locations.  Streeters' subsequent 1992 deed to Bradshaw conveyed the Merlette Property by reference to COS 10120 but expressly excluded the retained Ash Property from the conveyance by reference to COS 10404, which cut the Ash Property out of COS 10120 prior to the Bradshaw conveyance.  The 1992 Bradshaw deed expressly excluded the Ash Property by reference to COS 10404 and a redundant metes and bounds description lifted verbatim therefrom.  The 2000 Olson-Ash deed (Ash deed) described the Ash Property by reference to COS 10404 and a redundant metes and bounds plot running from a referenced point on the high-water mark "on and along" the high-water mark three specified courses, "577 feet more or less."[5]

¶4     In 2002, construction workers retained by Merlette excavated fill from Parker Lake to level a site for a new residence on the Merlette Property.  Ash complained to the U.S. Army Corps of Engineers that Merlette's fill excavation violated § 404 of the federal Clean Water Act prohibiting unpermitted dredging in streams, lakes, and wetlands subject to the

---

[5] Special Warranty Deed from *Pan American Bank, FSB*, to Barry L. Olson and Brenda M. Olson, Doc. No. 200006-16450, recorded in the official real property records of the Flathead County Clerk and Recorder on March 6, 2000.

Act. [6] After a site visit, the Corps issued correspondence, dated January 21, 2003, declaring Parker Lake as a non-navigable intrastate body of water beyond the Corps' jurisdiction pursuant to *Solid Waste Agency v. U.S. Army Corps of Engineers*, 531 U.S. 159, 121 S. Ct. 675 (2001) (federal jurisdiction limited to waters susceptible to interstate commerce and immediately adjacent wetlands).

¶5     Later in 2002, Ash placed a boat dock on the Parker Lake shoreline in front of her home.  Merlette objected, asserting that he owned all of the land below the high-water mark around the entire lake.  He accused Ash of trespass and insisted that she remove the dock immediately.  Ash eventually acquiesced and removed the dock.  In 2015, Ash again installed a dock on the lake in advance of listing her property for sale.  Merlette again protested on the asserted ground that he owned all of the land below the high-water mark around the lake.  The dispute escalated when Merlette pounded metal fence posts along the high-water mark bordering Ash's property and Ash removed and stacked them on Merlette's driveway.

¶6     After the parties exchanged correspondence through counsel, Ash filed suit on November 12, 2015, asserting claims for declaratory judgment and in tort based on alleged trespass and nuisance.  Ash further sought a temporary restraining order and preliminary injunction enjoining Merlette from interfering with her lake access pending final judgment. Merlette counterclaimed in trespass, asserting ownership of all land between the high- and low-water marks on the lake.  On November 24, 2015, the District Court granted Ash's

---

[6] 33 U.S.C. § 1334.

4

request for a temporary restraining order and, following hearing on December 1, 2015, issued a preliminary injunction enjoining Merlette from interfering with Ash's lake access. On December 28, 2016, Ash filed an amended complaint adding counts of intentional interference with her contractual relationship with her realtors and slander of title based on Merlette's alleged misrepresentations to third parties regarding his asserted ownership of all lake frontage on Parker Lake.

¶7 In January 2016, the parties filed cross-motions for summary judgment. On the ground that extrinsic evidence was not necessary or proper to construe the clear and unambiguous language in Ash's deed, the District Court denied Merlette's M. R. Civ. P. 56(f) motion to stay summary judgment and for further discovery. On November 7, 2016, the District Court granted summary judgment that Ash owned the land between the high- and low-water marks of Parker Lake bordering Ash's property. On February 22, 2017, the District Court certified its summary judgment order for immediate appeal pursuant to M. R. Civ. P. 54(b). We affirm and remand for further proceedings.

## STANDARD OF REVIEW

¶8 We review summary judgment rulings de novo for conformance to M. R. Civ. P. 56. *Dick Anderson Constr., Inc. v. Monroe Prop. Co.*, 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257. Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). Whether a genuine issue of material fact exists or whether a party is entitled to judgment

as a matter of law are conclusions of law subject to de novo review for correctness. *Ereth v. Cascade County*, 2003 MT 328, ¶ 11, 318 Mont. 355, 81 P.3d 463.

## DISCUSSION

¶9 *Did the District Court correctly conclude that Ash owns the land bordering her property between the high- and low-water marks of Parker Lake?*

¶10 As matters of federal and federally-derived state sovereignty over beds and banks of navigable waters, conveyances of land bordering navigable waters, as defined by federal law, cannot convey title below the high-water mark unless otherwise authorized by state law. *See PPL Montana, LLC v. Montana*, 565 U.S. 576, 589-91, 132 S. Ct. 1215, 1227-28 (2012) (riparian ownership acquired by western states on admission under federal "equal footing" doctrine); *Montana v. United States*, 450 U.S. 544, 551, 101 S. Ct. 1245, 1251 (1981) (ownership of land between the high-water marks of navigable waters generally adhered to the states upon statehood subject only to any retained federal easement and federal constitutional authority to regulate interstate commerce); *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 312 U.S. 592, 597, 61 S. Ct. 772, 775 (1941) (federal authority to regulate interstate commerce between high-water marks of navigable waters); § 70-1-202(1), MCA (state owns "all land below" water of navigable lakes and streams). Subject to Montana's limited public trust easement over state waters for fishing and recreational use between the high-water marks, *see* Mont. Const. art. IX, § 3; §§ 23-2-302(1), 70-1-202(1), and 87-2-305, MCA; *Galt v. State*, 225 Mont. 142, 147-48, 731 P.2d 912, 915-16 (1987), parties other than the state may acquire title to the midline of non-navigable waters and to the low-water mark of navigable waters. Section 70-16-201,

6

MCA.[7]   Thus, unless the source instrument of conveyance clearly and unequivocally provides otherwise, conveyances of land bordering on non-navigable waters convey title to the underlying land to the midline of the water body, while conveyances of land bordering on navigable waters convey title to the low-water mark.  Section 70-16-201, MCA.  Since Montana's public trust easement is not at issue here and a conveyance of land bordering on a water body conveys *at least* to the low-water mark unless otherwise provided by the conveyance, we need only address whether the District Court correctly construed the pertinent instruments of conveyance without consideration of whether Parker Lake is navigable or non-navigable.

¶11    Other than by operation of law, transfers of real property may occur only by written conveyance expressing the grantor's intent to convey particularly described property to another.  Sections 70-1-501, 70-2-101, and -102, MCA.  Except as otherwise provided by law, the language of an instrument of conveyance determines the nature and extent of title conveyed.  *Anderson v. Stokes*, 2007 MT 166, ¶ 32, 338 Mont. 118, 163 P.3d 1273.  Conveyance of real property by reference to a certificate of survey, as defined by §§ 76-3-103(1), -302(1), -401, -402, MCA, incorporates the referenced certificate of survey, including all notes, certifications, lines, descriptions, land marks, and depictions therein, into the deed as if set forth on the face of the deed.  *John Alexander Ethen Trust Agreement v. River Res. Outfitters, LLC*, 2011 MT 143, ¶ 27, 361 Mont. 57, 256 P.3d 913; *see also* § 70-20-201(6), MCA (construction and effect of deed reference to map); *Blazer*

---

[7] *See also* § 23-2-301(9), MCA (definition of "ordinary high-water mark").

*v. Wall*, 2008 MT 145, ¶¶ 31-36, 343 Mont. 173, 183 P.3d 84; *Halverson v. Turner*, 268 Mont. 168, 172-74, 885 P.2d 1285, 1288-89 (1994); *Bache v. Owens*, 267 Mont. 279, 283-86, 883 P.2d 817, 820-22 (1994).[8]  The construction of an instrument of conveyance, including the question of whether its terms are vague or ambiguous, is a question of law. *Mularoni v. Bing*, 2001 MT 215, ¶ 32, 306 Mont. 405, 34 P.3d 497.

¶12     Here, the parties agree with the District Court that the Ash Property lake frontage descriptions in COS 10404 and the Ash deed are consistent, clear, and unambiguous.[9]  They simply disagree about their meaning.  Ash agrees with the District Court that she owns the disputed land between the high- and low-water marks of Parker Lake bordering her property based on the presumption of § 70-16-201, MCA, and the meander line methodology for describing riparian borders.  Merlette contrarily asserts that the specific metes and bounds description of the Parker Lake boundary line in the source COS 10404 and the resulting Ash deed expressly limit the property to the high-water mark.

¶13     To the extent lawful and reasonably ascertainable, courts must construe instruments of conveyance to give full effect to the intent of the grantor at the time of the conveyance. *Anderson*, ¶ 33.  If the language of an instrument of conveyance is clear and unambiguous, the court must construe the instrument based on its express language and incorporated

---

[8] However, references and depictions in certificates of survey are sufficient to create a new property interest only to the extent that they adequately describe the interest and clearly manifest the grantor's intent to do so.  *Blazer*, ¶¶ 38-40.

[9] As a secondary fallback position in the event this Court might conclude that the instruments of conveyance of the Ash Property are ambiguous, Merlette alternatively asserts that certain extrinsic evidence precludes judgment as a matter of law and supports factual argument in his favor at trial.

references without resort to extrinsic evidence. Section 70-20-202(1), MCA; *Anderson*, ¶ 33; *Pilgrim v. Kuipers*, 209 Mont. 177, 180, 679 P.2d 787, 789 (1984). Extrinsic evidence is a relevant construction aid only if the language of the instrument of conveyance is vague or ambiguous. *Anderson*, ¶ 33. The language of a conveyance is ambiguous only if susceptible to two or more conflicting meanings, both of which are objectively reasonable. *Mary J. Baker Revocable Trust v. Cenex Harvest States, Co-ops., Inc.*, 2007 MT 159, ¶ 20, 338 Mont. 41, 164 P.3d 851. Mere disagreement about the meaning of particular terms or provisions does not render otherwise clear and unambiguous language ambiguous. *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 30, 336 Mont. 429, 154 P.3d 1189.

¶14     In construing instruments of conveyance, the court may not rely on isolated words or provisions. *Anderson*, ¶ 36 (citing *Rumph v. Dale Edwards, Inc.*, 183 Mont. 359, 368-69, 600 P.2d 163, 168-69 (1979)). The court must construe an instrument of conveyance in its entirety, giving effect to all within its four corners, and narrowly construing and subordinating any term or provision repugnant to the manifest general intent or purpose of the instrument. *Anderson*, ¶ 36. The court must liberally construe express reservations in grants of real property in favor of the grantor. Section 70-1-516, MCA. Except as otherwise expressly provided or necessarily implied from the language of the instrument, a conveyance of real property transfers to the grantee all title and interest then held by the grantor. Section 70-1-519, MCA.

¶15     Essential to this case is the well-settled methodology for surveying and describing riparian boundaries. Congressional acts from 1785 into the early 1800s required official

9

government surveys to subdivide all territories acquired by the United States north of the Ohio River and west of the Mississippi River (except Texas) into six-mile square townships, composed of 36 square-mile sections containing 640 acres each. *Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 2011 MT 263, ¶ 6, 362 Mont. 273, 264 P.3d 1065 (citing Joyce Palomar, *Patton and Palomar on Land Titles* vol. 1, § 116 (3d ed. 2003) and Curtis M. Brown, Walter G. Robillard, & Donald A. Wilson, *Evidence and Procedures for Boundary Location* 179-200 (2d ed. 1981)). *See also* Curtis M. Brown, Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles* (*Brown's*) § 6 (6th ed. 2009) (discussing the development of the Public Land Survey (PLS) system).[10] Where a true section or quarter-section corner would otherwise be located in "a water course," the PLS system required official government surveyors to run the converging straight section lines from the other "established corners . . . to the [edge of the] water course," thereby establishing "fractional townships" with the water course "designated as the *external boundary* of the fractional township." *Schurmeir v. St. Paul & P. RR. Co.*, 10 Minn. 82, 99-100 (Minn. 1865) (emphasis original) (citing 2 Stat. 313, 314 (1805) (construing Land Act of February 11, 1805, *in re* mode of surveying U.S. public lands). The PLS system thus required "an accurate survey of the meanderings of a water course" serving as external boundary of fractional townships by reference to a "meander line," *i.e.*,

---

[10] Due to rough terrain, bad weather, antiquated instruments, and occasional error, purported 640-acre sections often vary by a few inches to several hundred feet from a precise square mile. David E. Wolley and Lisa D. Herzog, *MERS: The Unreported Effects of Lost Chain of Title on Real Property Owners*, 8 Hastings Bus. L. J. 365, 366-69 (2012).

a "line showing the place of the water course and its sinuosities, courses, and distances." *Schurmeir*, 10 Minn. at 100. *Accord* Alan C. Morganfield & Charles Carpenter, *The Ins and Outs (and Zigs and Zags) of Legal Descriptions*, 102A Rocky Mtn. Min. L. Spec. Inst. 11, 49-51 (1998). Though originally applicable by federal statute only to lands surveyed and conveyed by the federal government, the PLS system meander line methodology became a generally accepted professional standard and practice for surveying and describing public and private lands bounded by water bodies. *See Brown's* § 1.2.

¶16 Consistent with this generally accepted standard and practice, a federal and state common law rule soon developed that, unless the language of a conveyance clearly and unequivocally manifests a more limited intent to fix a riparian boundary to the precise course specified in a property description, a riparian boundary[11] specified or depicted in an instrument of conveyance, or incorporated survey or plat map, is merely a meander line, *i.e., a mere approximation of* the ever-fluctuating and meandering edge of a water body intended as *the actual boundary line* of the property. *Andersen v. Monforton (Monforton)*, 2005 MT 310, ¶¶ 22-24, 329 Mont. 460, 125 P.3d 614; *North Shore v. Wakefield*, 530 N.W.2d 297, 302-03 (N.D. 1995); *Mitchell v. Smale*, 140 U.S. 406, 413, 11 S. Ct. 819, 821-22 (1891) (government land patents identifying lots conveyed by reference to the

---

[11] "Riparian" means "relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)." *Black's Law Dictionary* 1524 (Bryan A. Garner ed., 10th ed. 2014). A "riparian owner" is an owner of land "along, bordering upon, bounded by, fronting upon," or "abutting or adjacent and contiguous to" a non-tidal body of water. *Black's Law Dictionary* 1192 (5th ed. 1979).

official government survey plat "have the legal effect of a declaration that they extend to and are bounded by the lake or stream" with all regular "legal consequences of such a boundary in the matter of riparian rights and title to land under water" (internal punctuation omitted)); *Hardin v Jordan*, 140 U.S. 371, 380, 11 S. Ct. 808, 811 (1891) ("meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered" to the effect "that the waters themselves constitute the real boundary"); *St. Paul & Pac. R.R. Co. v. Schurmeir*, 74 U.S. 272, 286-87 (1868) ("[m]eander-lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser"). Except as otherwise clearly provided in the language of conveyance, a meander line merely approximates "the border-line of the stream" and signifies that the water course is the actual boundary rather than "the meander line . . . run on the land." *St. Paul & Pac. R.R. Co.*, 74 U.S. at 287. *Accord Faucett v. Dewey Lumber Co.*, 82 Mont. 250, 257-58, 266 P. 646, 648 (1928) (citing *Hardin* and *St. Paul & Pac. R.R. Co.*); *North Shore*, 530 N.W.2d at 302-03. Consequently, unless otherwise unequivocally provided on the face of the instrument, an instrument of conveyance describing a riparian boundary by reference to a particularized metes and bounds description, *i.e.*, a meander line, conveys title at least to the low-water mark of the body of water rather than the line precisely described by metes and bounds.

12

*Monforton*, ¶ 22 (synthesizing meander line methodology with § 70-16-201, MCA); *Faucett*, 82 Mont. at 257, 266 P. at 648.

¶17    In *Monforton*, a residential developer acquired and subdivided a large ranch property bordering on the Jefferson River in Madison County. *Monforton*, ¶¶ 7-8.  The source 1971 warranty deed to the developer, as well as the subsequent subdivision plat in reference to which the developer conveyed subdivision lots to third parties, described the property boundary along the Jefferson River by reference to a point on the bank of the river and then "meandering the right bank" along a series of specified courses that corresponded to the high-water mark.  *Monforton*, ¶¶ 10, 13. Years later, a subsequent owner, who acquired the undeveloped remainder of the original ranch property from the developer, sued river lot owners for declaratory judgment that the river boundary specified in the developer's source warranty deed, as carried forward in the subsequent subdivision plat and resulting lot deeds, specifically established the high-water mark as the actual boundary of the subdivision lots contrary to the presumption of § 70-16-201, MCA.  *Monforton*, ¶¶ 9-14.  The plaintiff thus asserted that owners of subdivision river lots had no river access because he owned the 11.4-acre strip between the high- and low-water marks along the subdivision boundary.

¶18    After recognizing the long-settled meander line methodology for describing riparian boundaries and the common law presumption codified in § 70-16-201, MCA,[12] we rejected

_____

[12] *See Faucett*, 82 Mont. at 259, 266 P. at 648 (noting that § 70-16-201, MCA, is a mere codification of the common law rule).

13

the plaintiff's assertion that the meander line methodology applies only to the official federal government land surveys from which it arose. *Monforton*, ¶¶ 18-24. Based on the presumption of § 70-16-201, MCA, the nature and purpose of meander lines, and an express reference to the described boundary as "meandering" along the river, we held that the specific metes and bounds description of the riparian boundary, which included references to monumental and non-monumental marks, was insufficient alone to "indicate an intent contrary to" the "low-water line" presumption of § 70-16-201, MCA. *Monforton*, ¶¶ 26-29. We so held notwithstanding that the metes and bounds description referenced and ran along the high-water mark, the existence of contrary extrinsic evidence, and that the river lot owners had not paid taxes on the adjoining property between the high- and low-water marks. *Monforton*, ¶¶ 26-29.

¶19 Similarly here, the parties do not dispute that their source common grantor (Streeters) owned at least to the low-water mark of Parker Lake.[13] The parties affirmatively agree that the Ash Property lake frontage descriptions in COS 10404 and the Ash deed are consistent, clear, and unambiguous. Mere disagreement about the meaning of the otherwise clear and unambiguous metes and bounds descriptions in COS 10404 and the Ash deed is insufficient to render those instruments ambiguous. *Heggem*, ¶ 30.

---

[13] *See* § 70-16-201, MCA (riparian owners generally own at least to the low-water mark depending on navigability).

¶20     While the descriptions in COS 10404 and the Ash deed do not use any form of the term "meander" to describe the property boundary along Parker Lake, express reference or use of the term "meander" in an instrument of conveyance is not talismanic. By nature, water bodies meander and their boundaries are meandering. *See, e.g., Faucett*, 82 Mont. at 257-58, 266 P. at 648; *St. Paul & Pac. R.R. Co.*, 74 U.S. at 286-87; *Brown's* 463 (defining "high-water mark"). With or without express reference to the term "meander," a metes and bounds description that plots a varying course, using specific measured distances running from precisely referenced points, to plot an otherwise non-uniform edge of a water body is an approximate meander line unless otherwise clearly provided in the instrument of conveyance. *Monforton*, ¶¶ 20-21.

¶21     Unlike other particularized metes and bounds descriptions intended to establish stationary boundary lines on the ground, the purpose of a particularized metes and bounds description along a water body is to provide a reasonably precise approximation of an ever-varying course along the non-stationary and non-uniform edge of the water body. *Monforton*, ¶¶ 20-24. The particularized approximation permits a reasonably precise description of the location and quantity of land bought or sold with the understanding that the actual boundary and quantity of the land varies with the fluctuating, meandering water line of the lake or stream. *Monforton*, ¶¶ 20-24. In turn, the meander line methodology of approximating riparian boundaries is consistent with the default rule of § 70-16-201, MCA, that the party who owns property to the high-water mark of a navigable or non-navigable body of water also owns the adjoining property between the high- and low-water marks

unless the source instrument of conveyance provides otherwise. *Monforton*, ¶ 25. Due to the inherent difficulty in describing a naturally meandering water body by uniform measurements, a conveyance of riparian property by reference to a specific metes and bounds description along the high-water mark is insufficient alone to overcome the presumption of § 70-16-201, MCA, that the grantee takes at least to the low-water mark. *Monforton*, ¶¶ 26-29.[14] *See also* § 70-1-519, MCA (conveyance of real property conveys all title held by the grantor in the subject property unless otherwise clearly provided by the instrument of conveyance).

¶22 As in *Monforton*, the metes and bounds descriptions of the Parker Lake frontage in COS 10404 and the resulting Ash deed are unquestionably meander line descriptions, *i.e.*, particularized metes and bounds plots approximately corresponding to the otherwise non-uniform edge of a meandering water body. Aside from express references to specific metes and bounds courses along the high-water mark, nothing in COS 10404 or the resulting Ash deed indicate any intent of the parties' common grantors (Streeters) to strip themselves, or successors, of the grantors' preexisting ownership of the land between the

---

[14] In other words, if a grantor actually intends to limit a riparian boundary to the high-water mark, or other described line, the grantor must expressly reserve or except the land below the high-water mark, or other described line, from the description of the subject tract by expressly declaring, in the subject deed and source COS or subdivision plat, that the described riparian boundary along the high-water mark, or other described upland line, is the actual boundary line rather than an approximate meander line. *North Shore*, 530 N.W.2d at 302-03. Any such reservation or exception that effects a "division of land," as defined by § 76-3-103(4), MCA, is of course subject to applicable provisions of the Montana Subdivision and Platting Act. *See* Title 76, chapter 3, MCA.

high- and low-water marks of Parker Lake along the Ash Property.[15]  Thus, in accordance with the presumption of §§ 70-1-519 and 70-16-201, MCA, Streeters retained ownership of the land between the high- and low-water marks along the Ash Property in COS 10404, which then carried forward to Ash under a successive conveyance referencing COS 10404 without limitation.  Merlette never acquired title to the land between the high- and low-water marks along the Ash Property because the source description of the property in COS 10404 was insufficient to separate the adjoining land below the high-water mark and the subsequent deed from Streeters to Bradshaw expressly excluded the Ash Property from the conveyance of the Merlette Property.  Bradshaw simply never owned the disputed land below the high-water mark to convey to Merlette even if he had intended to do so.[16]  Despite express reference to the high-water mark, the specific metes and bounds description of the riparian boundary of the Ash Property in COS 10404, as carried forward and repeated in substance in the Ash deed, was a meander line establishing the riparian boundary of the Ash Property at least to the low-water mark of Parker Lake pursuant to

---

[15] Despite his concession that the language of the subject instruments of conveyance are clear and unambiguous, Merlette suggests in a secondary fallback argument that Streeters' reservation of "lifetime fishing and boating privileges, including access to exercise said rights," in their 1992 conveyance of the Merlette property to Bradshaw evinces Streeters' awareness that they did not retain any ownership interest around Parker Lake below the high-water mark.  Streeters' rationale for including the reservation of a personal right vis-à-vis Bradshaw is indeed subject to speculation without resort to extrinsic evidence.  However, in addition to being consistent with their independent retention of previously acquired appurtenant lakefront access during their continued term of ownership of the Ash Property (Parcel A), the subsequent reservation of a personal right in the Bradshaw deed is insufficient as a matter of law to create ambiguity on the face of the prior source COS from which the Ash Property derived and from which the Merlette Property did not.

[16] Merlette has made no such showing or assertion.

§ 70-16-201, MCA. We hold that the District Court correctly granted summary judgment declaring that the Ash Property includes, and thus Ash owns, the disputed land between the high- and low-water marks of Parker Lake.

**CONCLUSION**

¶23 The specific metes and bounds description of the riparian boundary of the Ash Property in COS 10404, as carried forward and repeated in substance in the Ash deed, was a meander line description establishing the riparian boundary of the Ash Property at least to the low-water mark of Parker Lake. We hold that the District Court correctly granted summary judgment declaring that Ash owns the disputed land between the high- and low-water marks.

¶24 Affirmed and remanded for further proceedings.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ JIM RICE